IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LINDA WEINTRAUB

    v.                  :   Civil Action No. DKC 08-2669

MENTAL HEALTH AUTHORITY OF
ST. MARY'S, INC.

**MEMORANDUM OPINION**

Presently pending in this Title VII retaliation action are two motions: (1) a motion for summary judgment (ECF No. 76) filed by Defendant Mental Health Authority of St. Mary's, Inc. ("MHASM"), and (2) a motion for leave to file a surreply (ECF No. 81) filed by Plaintiff Linda Weintraub. The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court will deny both motions.[1]

---

[1] Weintraub's preferred surreply responds to MHASM's argument on reply that the Kathryn Hall deposition is hearsay. "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003). That is not the case here, as Weintraub submitted Hall's deposition with her opposition brief. As such, she "had the opportunity to support her [submission] with arguments and facts in her opposition brief; a surreply would not provide [Weintraub] with her first chance to address the issue." *Id*. at 606.

## I. Background

### A. Factual Background[2]

MHASM is a private, non-profit corporation that, until 2008, was charged with planning, managing, and monitoring publicly funded mental health services in St. Mary's County. Weintraub is a registered nurse with 12 to 15 years of experience as a psychiatric nurse. (ECF No. 79-35, 2). On September 18, 2004, MHASM hired Weintraub as a Case Management Supervisor, a position charged with supervising eight case managers. (ECF No. 79-3, at 3, 4). The position was a new challenge for Weintraub, who had never worked as a supervisor in the mental health field before she joined MHASM. (*Id.* at 4).

In the beginning, things went well between Weintraub and her supervisor, Executive Director Alexis Zoss. (ECF No. 76-2, at 5). The relationship began to sour, however, when Weintraub started conducting staff evaluations in December 2004. (*Id.* at 6-7). Weintraub, who had never before performed "formal" evaluations, was somewhat uncomfortable evaluating employees after working at MHASM for only three to four months prior. (*Id.* at 8, 10). Even so, she completed the evaluations and

---

[2] Unless otherwise noted, these facts are uncontroverted and construed in the light most favorable to Weintraub.

presented them to Zoss. Zoss was initially pleased. (*Id.* at 9).

Zoss' satisfaction disappeared when she reviewed the "numerical values" that Weintraub assigned to staff members and discovered that she did not agree with some of them. (*Id.* at 10). Zoss decided that she should assist in the scoring. (*Id.* at 11-12). At that point, evaluations became a collaborative effort, wherein Weintraub and Zoss consulted about the evaluations and discussed the numerical scores assigned to some particular employees. (*Id.* at 12-13). Weintraub did not always agree with Zoss' conclusions and sometimes felt they lacked a "sound" rationale. (*Id.*). Even so, she changed the scores when Zoss instructed her to do so. (*Id.*).

Kathryn Hall, a case manager at MHASM, was one of the employees who caused Weintraub and Zoss to disagree. (*Id.* at 42). Weintraub originally scored Hall at an "average" score of 57 (ECF No. 79-9), but Hall ultimately received an evaluation score of 38, categorized as a "below average" score.[3] (ECF No.

---

[3] Both Weintraub and Zoss signed Hall's evaluation. (ECF No. 76-3, at 2).

76-3).  Weintraub felt Hall's evaluation score was too low.[4]
(ECF No. 76-2, at 26-27).

After evaluations, Zoss remarked to Weintraub that "they
ha[d] to get rid of [Hall]."[5]  (ECF No. 79-3, at 7).  As a
result, Zoss decided to place Hall on a Performance Improvement
Plan ("PIP") - allegedly with the intention of setting Hall up
to fail and justify her dismissal.  (*Id.* at 8).  Zoss also spoke
with MHASM's counsel to determine "what it takes to get somebody
fired."  (*Id.* at 8).  While Zoss was designing the PIP, she
asked Weintraub to monitor Hall closely and to report frequently
on Hall's improvement or lack thereof.  (*Id.* at 9).

Weintraub sensed that Zoss' animus towards Hall stemmed
from something other than a pure evaluation of professional
incompetence.  (ECF No. 76-2, at 13 ("[I]t felt to me that there
was some other issues around that particular staff member that
were used as a judgment of her.")).  After asking several
people, Weintraub learned from fellow MHASM employee Jeanne

_____

[4]    Weintraub was not entirely happy with Hall's job
performance.  During the evaluation process, Weintraub told Zoss
that Hall had some "boundary" issues common to many mental
health workers, but that Weintraub was willing to work with Hall
on those issues.  (ECF No. 76-2, at 47; ECF No. 79-3, at 10).
Weintraub also conceded that she "may" have complained to Zoss
that Hall required too much supervision.  (ECF No. 76-2, at 25).

[5]    Zoss was the only person with the authority to fire
MHASM employees.  (ECF No. 76-2, at 42).

Owens that Hall had previously complained of sexual harassment by Hall's prior supervisor, Ed Perez.[6] (*Id.* at 14; ECF No. 79-36, at 2).[7] Weintraub also learned that Perez had been fired, forcing Zoss to hire Weintraub as a new supervisor. (ECF No. 76-2, at 16). Weintraub's discovery of the sexual harassment complaint "sort of put into truth [her] gut feeling" that Zoss had unfairly targeted Hall. (*Id.* at 15). Despite her concerns, Weintraub did not discuss the sexual harassment issue with Zoss because she was "uncomfortable" raising the issue with her boss. (*Id.* at 19, 21).

As she indicated to Weintraub she would do, Zoss placed Hall on a PIP shortly after the evaluations period. (ECF No. 79-3, at 13). During the time when Hall was on the PIP, Weintraub thought Hall improved and argued that Hall should keep her job.[8] (*Id.* at 18). Indeed, Weintraub told Zoss that it would be against her "work ethos" to fire Hall. (*Id.*).

---

[6] Perez allegedly sent Hall harassing emails. (ECF No. 79-7).

[7] Hall's sexual harassment complaint was also "a topic that some other people brought up in the office." (ECF No. 76-2, at 20).

[8] For instance, Hall noticed a patient suffering symptoms of lithium poisoning, which ultimately resulted in the patient being taken off lithium. (ECF No. 79-4, at 21).

Ultimately, however, Weintraub lost the argument and Zoss terminated Hall on March 11, 2005. (ECF No. 79-2).[9] Weintraub concluded that Zoss fired Hall because of Hall's complaints about Perez, as she "didn't see another reason." (ECF No. 79-3, at 6-7). Weintraub also told MHASM Board Member June Becker that she felt the Hall dismissal had been handled "inappropriately." (ECF No. 79-16, at 5, 10).[10] Becker's notes reflect that Weintraub viewed Zoss as a "sick woman." (ECF No. 29). The notes indicate that Becker and Weintraub discussed the fact that Hall "was let go because of what happened last summer" and specifically referred to Ed Perez. (*Id.*; ECF No. 79-16, at 11).

Following Hall's dismissal, Zoss approached Weintraub and asked for her notes and other documents concerning Hall. (ECF Nos. 79-29, at 4; 79-5, at 7). Weintraub resisted. (ECF Nos. 79-19, at 2; 79-29, at 4). Zoss also "yelled" at Weintraub to coerce her into signing another backdated evaluation for Hall, this time with a score of 29. (ECF Nos. 76-2, at 50; 79-3, at

[9] The EEOC eventually brought an action against MHASM on behalf of Hall. *See* EEOC v. Mental Health Auth. of St. Mary's, Inc., No. DKC 06-2554 (D.Md. filed Sept. 27, 2006). The case survived summary judgment and settled.

[10] During this meeting, however, Becker says Weintraub told her that "she was not even aware of the Ed Perez situation." (ECF No. 79-16, at 10).

13, 17; 79-5, at 10). Weintraub responded that she felt as if she was being asked to make things up and denied having played any part in the dismissal. (ECF Nos. 79-18, at 2; 79-29, at 4). Zoss in turn reminded Weintraub that she needed to support MHASM in the face of a lawsuit. (*Id.*). It became "clear" to Zoss that Weintraub was "uncomfortable" with the Hall matter. (ECF No. 79-5, at 10).[11]

Weintraub began having her own employment issues shortly after Hall left. As a new employee, Weintraub had begun her time at MHASM on a six-month probationary period. (ECF No. 76-2, at 28, 32). In March 2005, Zoss rated Weintraub a below average employee and extended Weintraub's probationary period by 60 days because, according to the evaluation, she needed to improve on "articulat[ing] management expectations" and providing support to staff. (ECF No. 76-7, at 3). In particular, Zoss' evaluation indicated that Weintraub needed to "develop more confidence in her identity as a supervisor." (*Id.*). Even so, the evaluation lauded Weintraub for "bring[ing] an enthusiastic commitment . . . as well as solid experience" to MHASM, and noted that she had been effective in "parlaying work

---

[11] Zoss' administrative assistant also confirmed that Zoss knew Weintraub "was making it very clear that she wasn't happy with [Hall] being fired." (ECF No. 79-14, at 5).

expectations across the unit." (*Id.*). Weintraub refused to sign the evaluation, saying it was punitive. (ECF No. 79-4, at 19). Zoss responded: "[Y]ou didn't back me up on Katy Hall. That's a problem." (*Id.*).

Zoss took Plaintiff off probation in May. (ECF No. 76-5, at 17, 21). Despite Weintraub's graduation from probationary status, Zoss remained unsatisfied with her work and gave her increased attention.[12] Zoss had several supervision and counseling sessions with Weintraub. (ECF No. 79-19). She encouraged Weintraub to read management articles. (*Id.* at 2). She provided "direction" on issues such as leave without pay. (ECF No. 79-31). But most importantly, Zoss eventually placed Weintraub on a 90-day PIP on September 6, 2005. (ECF Nos. 76-8, 76-10). The PIP required Weintraub to do four things: (1) create a plan for how client support funds would be spent and monitored; (2) demonstrate an understanding of the financial aspects of case management; (3) demonstrate an understanding of a management style that "fosters employee trust"; and (4) compile individual staff assessments on case management staff. (ECF No. 76-8, at 2).

_____

[12] Weintraub explained that she felt that she was "under observation." (ECF No. 76-2, at 25).

Weintraub apparently did not improve to Zoss' satisfaction.

Zoss then solicited and received letters from six employees

raising concerns about Weintraub, four of which were received

the day before Weintraub's termination. (ECF Nos. 76-13 to -

21). Some of the letters complained that Weintraub made

inappropriate statements about Zoss and subjected her case

managers to rash "daily supervision." (*Id.*). The employees

wrote that Weintraub made the atmosphere at MHASM "difficult"

(ECF No. 76-15), made work "stressful" (ECF Nos. 76-15, 76-17),

and generated a "level of paranoia" (ECF No. 76-20, at 2).

Zoss terminated Weintraub on October 14, 2005 for

misconduct. (ECF No. 79-6). The termination letter cited four

grounds for dismissal: (1) a complaint made against Weintraub by

an employee of Calvert Memorial Hospital;[13] (2) a complaint made

by an administrator at St. Mary's County Public Schools;[14] (3)

_____

[13]   Zoss explained that the hospital employee was
"concerned that Miss Weintraub was saying that the Mental Health
Authority would not assist in discharging a consumer from the
hospital." (ECF No. 76-5, at 5-10). The hospital employee
later testified that he was not angry about the situation, but
simply disagreed with Weintraub's decision. (ECF No. 79-20, at
5, 7).

[14]   Zoss states that Weintraub sent a letter instructing
that a child be transferred, even though Weintraub had not met
with the child and was not responsible for providing direct
services. (ECF No. 76-5, at 10-12). The school administrator
did not recall making any complaint to MHASM or Zoss. (ECF No.
79-21, at 6).

allegations made by Weintraub that the management was embezzling funds;[15] and (4) written complaints from staff. (*Id.*). Becker recalled that Weintraub was dismissed because of a "general feeling . . . of stirring up trouble around the Katy Hall situation as well as hard feelings between Alexis Zoss and Linda Weintraub." (ECF No. 79-16, at 8-9).

Though a number of facts are essentially uncontroverted, two important factual issues are in dispute.

First, there is some dispute over whether Weintraub provided Hall with a copy of Hall's earlier, "higher" evaluation, which was prepared solely by Weintraub. According to Hall, Weintraub told her that Zoss did not terminate her "because of . . . work performance. It was because of the supervisor Ed Perez." (ECF No. 79-11, at 11). Weintraub also purportedly gave Hall a copy of the original evaluation. (*Id.* at 11-12). Although Weintraub now endorses that account, in earlier deposition testimony Weintraub says she told Hall "that she was terminated based on her PIP and what Ms. Zoss felt was her performance at that time." (ECF No. 76-4, at 11). She suggested in that testimony that she did not mention the name Ed Perez to Hall. (*Id.* at 13-14).

---

[15]    Weintraub denies making any embezzlement allegations. (ECF No. 79-35, at 2).

Second, it is unclear whether Zoss instructed Weintraub to fire Hall and whether Hall refused any such request. Weintraub says that Zoss originally instructed her to fire Hall and Weintraub "simply refused to fire her." (ECF No. 76-2, at 37-39). Weintraub purportedly told Zoss that she would not fire Hall, saying, "[I]f you force me to do that, you may as well just fire me with her, too." (ECF No. 79-4, at 21; ECF No. 76-5, at 23). According to Zoss, however, Weintraub never refused to fire Hall because Zoss never instructed her to do so. (ECF No. 79-5, at 11).

### B. Procedural Background

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 7, 2006. (ECF No. 76-22). The EEOC issued a right to sue letter on July 24, 2007. Plaintiff then filed a complaint in this court on October 10, 2008 against MHASM and the Board of County Commissioners for St. Mary's County ("BOCC"), asserting a single count of retaliation under Title VII, 42 U.S.C. § 2000e-3(a). BOCC filed a motion to dismiss, or alternatively, a motion for summary judgment; the court granted that motion after determining that the BOCC could not be held liable because it was not a successor-in-interest to MHASM. (ECF No. 31). The court affirmed its decision on reconsideration. (ECF No. 38).

MHASM, the remaining defendant in this case, then filed a motion for summary judgment on March 2, 2010.  (ECF No. 76).

## II.  Analysis

### A.  Standard of Review

MHASM has moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

Title VII prohibits an employer from retaliating against an employee who exercises her Title VII rights. 42 U.S.C. § 2000e-3. Weintraub asserts that MHASM did just that by firing her because she opposed Hall's dismissal and participated in Hall's EEOC claim. Weintraub may avert summary judgment here in one of two ways. First, she could offer direct evidence of retaliation under the ordinary standards of proof. Alternatively, she may use the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). In the end, Weintraub has successfully navigated the second course – her claim survives under *McDonnell Douglas*.[16]

_____

[16] Weintraub also contends that she has provided direct evidence of retaliation; MHASM offers no response. Because Weintraub has satisfied the *McDonnell Douglas* standard, there is no need to analyze this additional avenue of proof.

To survive summary judgment under *McDonnell Douglas*, Weintraub must first establish a *prima facie* case composed of three elements: (1) she engaged in protected activity; (2) MHASM took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Davis v. Dimensions Health Corp.*, 639 F.Supp.2d 610, 616 (D.Md. 2009); *accord Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). "Plaintiff's burden to establish a *prima facie* case is 'not onerous' and only requires that a plaintiff prove each element by a preponderance of the evidence." *Davis*, 639 F.Supp.2d at 617 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If Weintraub can make such a showing, the burden then shifts to the employer to offer a legitimate, non-retaliatory basis for the adverse employment action. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001). "The employee then has the opportunity to prove that the asserted reason is pretextual." *Davis*, 639 F.Supp.2d at 617 (citing *Matvia*, 259 F.3d at 271).

## A. *Prima Facie* Case

MHASM argues that Weintraub has not established a *prima facie* case of retaliation because (1) Weintraub did not engage in a protected activity and (2) there was no causal connection

14

between Weintraub's alleged protected activity and her termination.[17]  MHASM is wrong on both counts.

### 1.  Protected Activity

Section 704(a) of Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "Protected activity of an employee, therefore, can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause)."  *Pitter v. Cmty. Imaging Partners, Inc.*, No. DKC 07-2968, 2010 WL 3259994, at *12 (D.Md. Aug. 18, 2010).  In this case, Weintraub has shown that she opposed an unlawful practice.[18]

---

[17]  MHASM concedes the second element of the *prima facie* case, that Weintraub suffered an adverse employment action.

[18]  Having found that Weintraub engaged in protected activity under the opposition clause, there is no need to consider Weintraub's participation-based argument.

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). A plaintiff in a Title VII retaliation case need "only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003). The relevant inquiry is whether (1) the plaintiff subjectively (in good faith) believed that the defendant engaged in an unlawful action; and (2) whether this belief was objectively reasonable in light of the facts. *Id.*

A reasonable jury could find that Weintraub engaged in a protected activity by opposing Zoss' unlawful termination of Hall. In making her initial evaluation of Hall, Weintraub noted certain weaknesses in Hall's performance but argued that none of those weaknesses necessitated her dismissal. She disagreed with Zoss' decision to nevertheless lower Hall's evaluation score and place her on a PIP. During Hall's time on PIP, Weintraub continued to advocate on Hall's behalf and told Zoss that she should keep her job. There is evidence indicating that Weintraub flatly refused to fire Hall when Zoss ordered her to do so. Even after Hall was gone, Weintraub expressed her

disagreement with Zoss' handling of the situation and refused to help her in amassing evidence to resist Hall's EEOC complaint. She even approached an MHASM Board member with whom she discussed the Ed Perez matter. In short, a jury could view these acts as an ongoing protest of an employment practice that Weintraub believed to be unlawful.

MHASM questions whether Weintraub engaged in any oppositional activity because she did not raise her concerns with the MHASM Board or with Zoss, and characterizes Weintraub's refusal to fire Hall as unprotected. The Supreme Court, however, has already foreclosed such an argument, stating: "[W]e would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 129 S.Ct. 846, 851 (2009); *see also Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 47 (1st Cir. 2010) ("*Crawford* recognized that an employee can oppose unlawful employment practices by his or her conduct."). MHASM advances an untenably narrow definition of opposition when it insists that only writing a letter or complaining to the Board would be protected. (ECF No. 76-1, at 41).

Contrary to MHASM's insinuations, Weintrab is also not required to utter the magic words "Title VII" in opposing Zoss' retaliatory dismissal of Hall. Context matters. Here, one could determine from the context that Weintraub's fervent defense of Hall was animated by Title VII concerns. *See, e.g.*, *Martin v. State Univ. of New York*, 704 F.Supp.2d 202, 229 (E.D.N.Y. 2010) ("[A] supervisor who acts as an advocate for the alleged victim may be said to have engaged in opposition under Title VII."). Although Weintraub may have expressed other reservations about Hall's dismissal that were unrelated to employment discrimination, that fact does not change the analysis. "Opposition to an [unlawful activity] does not need to stand separate and apart from any other criticism of management in order to be entitled to protection under the anti-retaliation provision." *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3$^{\text{d}}$ Cir. 2006).

Additionally, MHASM attacks the reasonableness of Weintraub's opposition. According to MHASM, Weintraub could not "reasonably believe[] that any actions taken by Zoss . . . were based on Hall's [sexual harassment] complaint" because she did not discuss that complaint directly with either Hall or Zoss (ECF No. 76-1, at 39), but instead based her belief on only a "gut feeling" (*id.* at 41). Weintraub's "gut feeling," however,

had a reasonable basis in fact – she did not simply summon those facts out of the ether and then rely on them.[19]    Although Weintraub's knowledge of the facts came largely from third parties or her own observations, those facts supported a reasonable belief that Zoss engaged in an unlawful practice by firing Hall.    Unlike the case cited by MHASM, *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338-39 (4th Cir. 2009), Zoss' retaliatory conduct was not a single, isolated incident, but was instead a long pattern of behavior reflecting an unlawful hostility towards Hall.    Indeed, in looking at the same pattern of behavior that Weintraub witnessed, this court concluded that Hall's termination presented a *prima facie* case of retaliation. *See EEOC v. Mental Health Auth. of St. Mary's, Inc.*, No. DKC 06-2554, 2008 WL 53254 (D.Md. Jan. 2, 2008).    Just as in that case, "Zoss' indications that she wanted to fire Hall, her insistence on subjecting her to increased scrutiny, her refusal to respect [Weintraub]'s requests that [Hall] be removed from probationary status, and her lowering of [Hall's] performance reviews during the period in question" all provided Weintraub with evidence that Zoss was driven by improper considerations.    *Id.* at *8. She is not required to draw these facts directly from

---

[19]    Notably, MHASM does not suggest that Weintraub's view of the facts was wrong.

19

conversations with Zoss or Hall.  As such, Weintraub's belief that Hall's dismissal was unlawful was "objectively reasonable in light of the facts." *Peters*, 327 F.3d at 321.

### 2. Causal Connection

Weintraub has also established that there was a sufficient causal connection between her termination and her opposition to Hall's dismissal.  "Normally, very little evidence of a causal connection is required to establish a *prima facie* case." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *abrogated on other ground by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.s. 101 (2002).  Nevertheless, MHASM points to the seven-month intervening period between Hall's termination and Weintraub's termination as an indication that there is no link.

Time is certainly important when deciding whether there is a connection between a protected activity and an adverse employment action.  A court may easily find a *prima facie* causal connection "where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price*, 380 F.3d at 213.  On the other hand, "the passage of time . . . tends to negate the inference of discrimination." *Id.*  Time, however, does not stand alone. "[C]ourts may look to the intervening period for other evidence

of retaliatory animus" in cases lacking temporal proximity. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quotation marks and citations omitted).

Roughly seven months passed between Hall's termination and Weintraub's termination. Seven months may be close enough to assume a causal link. *See Brockman v. Snow*, 217 F.App'x 201, 207 (4th Cir. 2007) ("We have not decided how close a temporal connection must exist for there to be a causal nexus, but our precedent establishes that several months is sufficiently proximate to satisfy the requirement."). Indeed, the Fourth Circuit has found causal connections in cases involving longer intervening periods. *See, e.g.*, *Price*, 380 F.3d at 213 (finding causal connection despite nine to ten month gap of time).

But even if one grants MHASM's argument that seven months is too long to assume a connection based on mere temporal proximity, that is not fatal to Weintraub's case. The possibility of "other evidence" of animus means the court cannot simply count the days or months between the relevant acts and rule accordingly. And in fact, Weintraub has provided "other evidence" of retaliatory animus during the intervening seven-month period. Before her confrontation with Zoss over Hall's dismissal, Weintraub had a favorable relationship with Zoss. There were no evident complaints about Weintraub's performance.

But almost immediately following the Hall incident, that relationship spiraled quickly into decline: Zoss gave Weintraub a below-average employment review, extended her probationary period, subjected her to increased supervision, compelled her to attend "counseling" sessions, and eventually placed her on a PIP.[20] Although MHASM protests that Weintraub did not receive any "formal" discipline for roughly five months, conduct need not be "formal" to evidence retaliatory animus. *See Lettieri*, 478 F.3d at 650-51 (citing informal activities, such as reduction of job responsibilities, as evidence of animus).

MHASM also argues that Zoss – the relevant decisionmaker - was "utterly unaware that [Weintraub]'s refusal to participate in Hall's termination was based on any *protected* activity." (ECF No. 76-1, at 43). MHASM is correct that the "first thing" Weintraub must prove is Zoss' "knowledge that [s]he engaged in a protected activity." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). Typically, the knowledge requirement comes into play when the decisionmaker is entirely

---

[20] Indeed, many of these actions may be sufficiently grave as to constitute adverse employment actions in and of themselves. *See, e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (noting that poor performance evaluation score or placement on probationary period may constitute adverse employment action for purposes of Title VII retaliation claim).

unaware that the plaintiff performed some act, like filing an EEOC claim. *See, e.g.*, *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (4th Cir. 2009).

The issue in this case is slightly different. Weintraub has presented facts indicating that Zoss was aware of her opposition to Hall's dismissal. MHASM suggests, however, that knowledge of those basic facts is not enough. It contends that Zoss was unaware that such opposition was protected because Weintraub's complaints were not couched in terms of retaliation. Thus, this case raises the issue of whether an employer has the requisite knowledge if the employer does not recognize an act as protected even if the employee intends it to be.

An unreported case from the Fourth Circuit, *Shields v. Fed. Express Corp.*, 120 F.App'x 956 (4th Cir. 2005), found insufficient causation where the employee had not established the requisite degree of knowledge. In *Shields*, Michael Shields complained to his supervisor, Patrick Quirke, that one of the employees Shields supervised, Rva Pendleton, should not receive discipline. *Id.* at 959-60. In Shields' mind, the unnecessary discipline stemmed from racial discrimination, but his complaints to Quirke focused more on general issues of fairness and leniency. *Id.* In these circumstances, the Fourth Circuit

reasoned that Quirke had no knowledge that Shields engaged in a protected activity despite Shields' undisclosed intentions:

> Although Shields voiced his disagreement regarding Quirke's proposed discipline of Pendleton, it is undisputed that Shields did not communicate to Quirke or any one else at FedEx that he was opposing what he believed to be a racially discriminatory action. Instead, Shields's own testimony revealed that his complaints focused on basic fairness as he believed that Pendleton should have been afforded leniency because of her inexperience, and that Dalton should receive identical discipline. Having presented no evidence of Quirke's knowledge that Shields was engaged in protected activity when he opposed the discipline administered to Pendleton, Shields failed to show the required causal link to the alleged adverse employment actions.

*Id.* at 962-63.

In contrast to *Shields*, where Shields protested once and then acquiesced, Weintraub continually and affirmatively resisted the decision to fire Hall.[21] By raising the issue of her opposition over and over again, she demonstrated a level of resistance that would suggest to a reasonable individual that her opposition stemmed from more than notions of simple fairness. Weintraub also continued to express discomfort at helping Zoss deal with "the Hall issue" after it became clear

_____

[21] Michael Shields ultimately approved the discipline that he initially complained of. *Shields*, 120 F.App'x at 959.

that Hall was going to file an EEOC claim. Weintraub's unwillingness to support the "agency's position" in an EEOC action would, again, suggest that the opposition related to the Title VII conduct at issue in the EEOC proceeding. (*See, e.g.*, ECF No. 79-19, at 3 (notes from Zoss indicating she spoke with Weintraub about "EEOC issue that she'd been so upset about")). In short, Zoss could have "reasonably have understood [] that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2$^{d}$ Cir. 1998); *see also Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) ("A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression."). *Cf. Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 513-14 (6th Cir. 2008) (finding, under state anti-retaliation statute, that jury could infer employer knowledge of protected activity where employer was aware of employee's lawsuit, even though employer contended it was unaware of substance of suit). That conclusion is undeniably supported by the fact that Zoss was angered when Weintraub did not "back her up" and instead "stirr[ed] up trouble" in the Hall matter.

Such an outcome is consistent with the Supreme Court's approach in Title VII retaliation cases that post-date *Shields*.

25

In *Burlington Northern and Santa Fe Railway Co. v. White*, 548
U.S. 53, 67 (2006),[22] for instance, the Court stressed that
courts are to "interpret[] the antiretaliation provision to
provide broad protection from retaliation [in order to] help[]
ensure the cooperation upon which accomplishment of the Act's
primary objective depends."   More recently, in *Crawford v.
Metropolitan Government of Nashville and Davidson County,
Tennessee*, 129 S.Ct. 846, 850 (2009), the Court again read the
anti-retaliation provision broadly.   Specifically, it concluded
that the provision encompassed responses to questions in the
course of an internal investigation where the answers gave "an
ostensibly disapproving account of sexually obnoxious behavior
toward her fellow employee."   *Id.*   These decisions suggest that
an employee who speaks out against Title VII violative behavior
– even in a general sense - should enjoy the protections of the

---

[22]   MHASM makes an argument based on *Burlington Northern*
that there is no causal connection; it states that "[t]here are
no material facts in dispute, which suggest Plaintiff was
objectively 'dissuaded from complaining' after she allegedly
refused to terminate Hall."   (ECF No. 76-1, at 45 (quoting
*Burlington Northern*, 548 U.S. at 69-70)).   *Burlington Northern*
holds that Title VII's anti-retaliation provision may extend to
retaliatory acts outside the workplace or employment context.
*Id.* at 2414.   The language MHASM quotes merely addresses what
level of injury or harm such an act must reach before it becomes
actionable.   *Id.* at 2415.   Obviously, the question of
materiality has nothing to do with whether there was a causal
connection.

anti-retaliation provision. Just like the plaintiff in *Crawford*, Weintraub's protest reflected "an ostensibly disapproving" assessment of Hall's retaliatory dismissal that is worthy of Title VII protection.

**B.    Legitimate, Non-Retaliatory Reasons and Pretext**

Finally, the court must determine whether MHASM has offered legitimate and non-retaliatory reasons for Weintraub's dismissal "and, if so, whether [Weintraub] can show that the reason is false and, ultimately, that the employer retaliated against [her]." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). Weintraub can establish pretext by showing that MHASM's proffered explanations are "unworthy of credence" or by "offering other forms of circumstantial evidence sufficiently probative of retaliation." *Price*, 380 F.3d at 212 (brackets removed). The job of the court is not to hyper-scrutinize the employer's decision. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Grice v. Baltimore Cnty., Md.*, 354 F.App'x 742, 748 (4th Cir. 2009) (quoting *Giannopoulos v. Branch & Brock Confections, Inc.*, 109 F.3d 406, 411 (4th Cir. 1997)).

MHASM has put forth several reasons for Weintraub's termination. In particular, MHASM points to the letters of complaint filed by various employees, Weintraub's failure to improve certain budget and staff related issues, and Weintraub's unwillingness to work with Zoss in counseling. Complaints of inappropriate behavior, a failure to improve inadequate work performance, and insubordination are all legitimate reasons for taking an adverse employment action. *See, e.g., Morrall v. Gates*, 370 F.App'x 396, 398 (4th Cir. 2010) (insubordination); *Amirmokri v. Abraham*, 266 F.App'x 274, 280 (4th Cir. 2008) (unsolicited complaints of inappropriate behavior); *Rana v. United States*, 812 F.2d 887, 889 (4th Cir. 1987) (failure to improve unacceptable performance).

Thus, the burden shifts back Weintraub to establish pretext. She points to several reasons why a jury could reasonably conclude that MHASM's proffered reasons are pretextual.

First, the reasons MHASM has given for Weintraub's dismissal have frequently changed. Supposedly, Zoss initially placed Weintraub on a PIP because she struggled with budgetary issues and sometimes failed to understand her role as a supervisor. The termination letter crafted several new reasons to justify Weintraub's termination: two incidents that each

occurred several weeks prior to termination, certain "allegations of embezzlement" purportedly made by Weintraub, and four written complaints from employees. Now, at summary judgment, it offers an additional reason: "Plaintiff's disregard with respect to Zoss' efforts to counsel Plaintiff in these areas." (ECF No. 76-1, at 47).

The fact that an employer offers "different justifications at different times . . . is, in and of itself, probative of pretext." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001). Ever-shifting explanations are especially problematic when new justifications appear late in the chain of events; such a "late appearance" might indicate that the new rationale is a *post hoc* justification rather than genuine support for an innocent decision. *Id.* at 853; *see also Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 298 (4th Cir. 2010) (dubbing a justification "dubious" when it appeared "only late in the game"). New justifications also create special cause for concern where, as here, the employer is alleged to have engaged in a similar exercise of *post hoc* rationalization after the purportedly retaliatory dismissal of another employee. *See Merritt*, 601 F.3d at 301 (explaining that the "corporate environment" can place an employer's actions "in a less neutral context").

Second, Weintraub has submitted specific evidence that, if credited by a jury, could support a finding that each of MHASM's reasons for dismissal were false. *See Dey*, 28 F.3d at 1460-61 ("A detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decision."). The two incidents discussed in Weintraub's termination letter, for example, were apparently treated as relatively minor incidents by the school administrator and hospital employee involved. Indeed, one purported complainant does not remember complaining to Zoss at all. Weintraub has also offered evidence that she never circulated rumors about embezzlement, as the termination letter suggests. The very performance evaluation that first extended Weintraub's period of probation also praised her. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 407-08 (4th Cir. 2005) (finding evidence of pretext in positive annual performance evaluations). In sum, there are good factual reasons to question each of the reasons provided by MHASM.

Third, and finally, there are certain facts that suggest pretext that are not as amenable to neat categorization. For one, it is noteworthy that Zoss, the very individual alleged to have committed the retaliatory act, played such a significant

30

role in assembling, collecting, and soliciting that facts that are now offered to support Weintraub's termination. Zoss' substantial involvement could suggest to a reasonable factfinder that those facts must be looked upon with a skeptical eye. *See, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2[d] Cir. 1998) (noting that jury might infer pretext from fact that most evidence was generated by individuals responsible for violative action). Moreover, the timing of the employee complaint letters – which were apparently received in a single two-day period right before Weintraub's dismissal - could also lead a jury to conclude that something less than honest reporting was going on. Finally, Zoss fired Weintraub roughly a month into her three month PIP. That "departure[] from the normal procedural sequence" might also indicate pretext. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168-169 (1st Cir. 1998).

In sum, the evidence taken as a whole reflects that Weintraub has carried her burden under the *McDonnell Douglas* framework. Summary judgment cannot be granted.

## IV.  Conclusion

For the foregoing reasons, MHASM's motion for summary judgment will be denied and Weintraub's motion for leave to file a surreply will be denied.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
